**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**

| | |
|---|---|
| **SHAWN WHITE,** | ) |
| Plaintiff, | ) ) ) |
| v. | ) CASE NO.: 23-cv-476 ) |
| **OUTOKUMPU STAINLESS USA, LLC,** | ) ) ) |
| Defendant. | ) ) ) |
| _____ | ) |

## COMPLAINT

Plaintiff Shawn White brings this action against Defendant Outokumpu Stainless USA, LLC ("Defendant"). Plaintiff seeks relief under the Fair Labor Standards Act of 1938 ("FLSA") 29 U.S.C. §§ 201, et seq.

## JURISDICTION AND VENUE

1.  This Court has jurisdiction over Plaintiff's FLSA claims pursuant to 29 U.S.C. §§ 201, et seq. and 28 U.S.C. § 1331.

2.  Venue is this Court is proper pursuant to 28 U.S.C. § 1391(b).

## PARTIES

3.  The Plaintiff is an individual who was employed by Defendant as a caster operator in the Melt Shop of Defendant's facility in Mobile County, Alabama from approximately March, 201 until approximately April 6, 2021. Plaintiff resides in Mobile County, Alabama.

1

4. Defendant Outokumpu Stainless USA, LLC is a corporate entity registered to do business in Alabama. Defendant is subject to personal jurisdiction in the State of Alabama for purposes of this Lawsuit.

5. At all times material to this action, Defendant has been an enterprise engaged in commerce or in the production of goods for commerce as defined by § 203(s)(1) of the FLSA.

6. Defendant is an interstate company whose employees are engaged in interstate commerce and whose employees handle and/or work on goods that moved in and/or were produced in commerce.

7. Defendant is an employer covered by the record-keeping, minimum wage, and overtime mandates of the FLSA.

8. The Plaintiff performed work for Defendant in Mobile County, Alabama as a non-exempt, hourly, manufacturing "employee" of Defendant as "employee" is defined by § 203(e)(1) of the FLSA. All the factual allegations set out herein pertain to practices of Defendant at its Mobile County, Alabama facility.

9. Defendant is an employer which is required, pursuant to 29 CFR § 516.2 (a) to maintain and preserve for each employee information and data identifying the regular hourly rate of pay for any workweek in which overtime compensation is due, and the basis of pay by indicating monetary amounts paid on a per hour, per day, per week, or other basis and the total wages paid for each pay period.

## FACTS

10. At all relevant times until May 6, 2018, Defendant's timekeeping and/or pay systems were pre-set to automatically round down for pay purposes the time that an employee

clocked in before a scheduled shift to the scheduled start time up to a maximum of 30 minutes. Employees who clocked in even 1 minute after the scheduled start of a shift were assigned "occurrences" which were tallied and could lead to discipline and termination. If employees clocked out even 1 minute before the scheduled end of shift, they were also assigned "occurrences" which were tallied and could lead to discipline and termination. When employees clocked out between 1 and 14 minutes after the scheduled end of shift, the time worked was automatically rounded down to the scheduled end of shift. Employees who clocked out more than 15 minutes after the scheduled end of shift without obtaining approval were also given "occurrences" that could lead to discipline or termination. Plaintiff was subject to all of these policies and practices.

11. From May 6, 2018 through April 6, 2021 Defendant's timekeeping and/or pay systems were pre-set to automatically round down for pay purposes the time that an employee clocked in before a scheduled shift to the scheduled start time up to a maximum of 7 minutes. During that May 6, 2018 – April 6, 2021 period Defendant's timekeeping and/or pay systems would automatically round recorded time when an employee clocked out after the scheduled end time of a shift to the scheduled end time up to a maximum of 7 minutes. Defendant instructed its hourly employees, including Plaintiff, not to clock in more than 7 minutes before the scheduled start of shift. "Occurrences" are assigned when employees clock in either 1 minute (or more) after the scheduled start of a shift, or 1 minute (or more) before the scheduled conclusion of a shift. Defendant instructed its hourly employees, including Plaintiff, not to clock out more than 7 minutes after the scheduled end of shift. Employees who clock out more than 7 minutes after the scheduled end of shift without supervisor authorization are given an "occurrence." The Defendant's Rounding Policy as of May 6, 2018 stated that even if employees clock in more than 7 minutes early, the time the employees were clocked in would not be rounded up for pay purposes

but, instead "the time clock will prompt pay to begin at the actual clock in time. This will constitute unapproved, unpaid time and will be adjusted to reflect such." Plaintiff was subject to all of these policies and procedures.

12.     Defendant's Team Member Handbooks issued August 31, 2018 and as revised July 8, 2020 state that employees who clock in more than 7 minutes before the scheduled start of a shift, or more than 7 minutes after the scheduled end of a shift "are subject to discipline up to and including termination of employment for the unapproved time." Plaintiff was subject to all of these policies.

13.     Defendant's Team Member Handbooks issued August 31, 2018 and as revised July 8, 2020 informed OTK's employees they were "expected to be at their work areas and dressed in the appropriate uniform / PPE at the beginning of their shift." Plaintiff was subject to these policies and expectations.

14.     Under Defendant's timekeeping practices until May 6, 2018, for example, if Plaintiff clocked in at 5:41 p.m. for a scheduled shift at 6:00 p.m., he was not paid for time worked until 6:00 p.m. unless Defendant's supervisory personnel manually over-rode the automated rounding by Defendant's timekeeping and/or pay system.

15.     Under Defendant's timekeeping practices from May 6, 2018 – November 27, 2018 if Plaintiff clocked in at 5:54 p.m. for a scheduled shift at 6:00 p.m. he was not paid for time worked until 6:00 p.m. unless Defendant's supervisory personnel manually over-rode the automated rounding by Defendant's timekeeping and/or pay system.

16.     Defendant's stated reason for its change in practices effective May 6, 2018 was to "align our timekeeping with Department of Labor regulations."

17. Since at least 2009, the regulations promulgated pursuant to the FLSA allowed "rounding" of time to the nearest quarter hour. The regulations only allow for rounding time "down" to result in 7 minutes of unpaid work. The regulations also only allowed for "rounding" time down if time would also be rounded "up" under an arrangement that "averages out so that the employees are fully compensated for the time they actually worked." 29 CFR 785.48(b)

18. Defendant was made aware by its own attorneys in May, 2018 that timekeeping practices which allow employees to clock in before the start of a shift without being penalized (or paid) but which also provide for discipline if employees clock in even a minute after the start of a shift are not neutral and are potentially unlawful. After receiving this advice from its attorneys, Defendant adopted exactly the sort of practice its attorneys had explained would be non-neutral and unlawful in practice.

19. Defendant was also advised by its attorneys in May 2018 that a facially neutral rounding practices can be eviscerated by "by instructing employees, for example, not to clock in more than 7 minutes before the hour." After receiving this advice from its attorneys Defendant intentionally violated the FLSA by including in its August, 2018 Team Member Handbook warnings to employees that they may be terminated if they clock in more than 7 minutes before a shift.

20. At all relevant times, Defendant has assumed for pay purposes that employees such as Plaintiff work from the time he clocks in until he clocks out.

21. Defendant's time records show the exact time that employees, including Plaintiff, clock in and out.

22. When Plaintiff would arrive at work and clock in he would them almost immediately "make relief" by coordinating the status of his work duties with departing employees

from the prior shift. Typically, this was done after walking about 30 yards from where Plaintiff clocked in, which took less than a minute. Plaintiff's supervisors knew that Plaintiff, like his co-employees, made relief because Plaintiff's supervisors emphasized that making relief was important and expected. Defendant did not do anything to keep track of when Plaintiff made relief. Only clock punches are taken into consideration by Defendant for pay purposes.

23. Plaintiff would also make relief at the end of a shirt before clocking out. Employees, like Plaintiff, cannot clock out and leave before the scheduled end of their shift without receiving points towards termination.

24. Through April 6, 2021 Defendant's practices and procedures ensured that Plaintiff was not, on average, fully compensated for time actually worked. Defendant's "rounding" arrangement averaged out so that Plaintiff would be paid for less time than he actually worked as quantified by the times clocked in and out.

25. Each week for which overtime pay obligations are based upon 29 U.S.C. § 207(a) stands alone and entitlement to overtime pay for a particular work week cannot be calculated based on averaging, or aggregating, hours worked in any other week for hourly exempt employees such as the Plaintiff. At all relevant times, Defendant was aware that 29 CFR § 778.104 provides:

> The Act takes a single workweek as its standard and does not permit averaging of hours over 2 or more weeks. Thus, if an employee works 30 hours one week and 50 hours the next, he must receive overtime compensation for the overtime hours worked beyond the applicable maximum in the second week, even though the average number of hours worked in the 2 weeks is 40. This is true regardless of whether the employee works on a standard or swing-shift schedule and regardless of whether he is paid on a daily, weekly, biweekly, monthly or other basis. The rule is also applicable to pieceworkers and employees paid on a commission basis. It is therefore necessary to determine the hours worked and the compensation earned by pieceworkers and commission employees on a weekly basis.

26. At all relevant times, Defendant was aware that 29 CFR § 778.105 provides that:

> An employee's workweek is a fixed and regularly recurring period of 168 hours - seven consecutive 24-hour periods. It need not coincide with the calendar week but may begin on any day and at any hour of the day. For purposes of computing pay due under the Fair Labor Standards Act, a single workweek may be established for a plant or other establishment as a whole or different workweeks may be established for different employees or groups of employees. Once the beginning time of an employee's workweek is established, it remains fixed regardless of the schedule of hours worked by him. The beginning of the workweek may be changed if the change is intended to be permanent and is not designed to evade the overtime requirements of the Act. The proper method of computing overtime pay in a period in which a change in the time of commencement of the workweek is made, is discussed in §§ 778.301 and 778.302.

27. Throughout his employment, Plaintiff was assigned an hourly rate of pay that generally applied to work performed from 6:00 a.m. – 6:00 p.m. For time worked between 6:00 p.m. and 6:00 a.m. an additional $.50 an hour premium was added to the rate of pay.

28. The Earnings Statements employees, like Plaintiff, receive document overtime rates of pay with the number of hours quantified over periods of two weeks or approximately two weeks.

29. At all times during Plaintiff's employment Defendant's Human Resources personnel were aware that Defendant was paying its hourly employees, including Plaintiff, what Defendant characterized as overtime pay at rates that were less than 1.5 X the rates its employees, including Plaintiff, were paid for work during 168 hour periods. The Earnings Statements Defendant had issued to its employees showed overtime pay rates that were less than 1.5 X the rates of pay for work during 168 hour periods.

30. The overtime rates of pay for what Defendant characterizes as overtime pay differ depending on whether Defendant chooses to classify time as "Overtime" or "Shift OT Hrs."

31. The formulas Defendant used to calculate overtime pay rates include a sub-formula for "RROP."

32. Defendant does not know what formulas were actually used to calculate "RROP" for its hourly employees, such as Plaintiff, through the conclusion of Plaintiff's employment.

33. Defendant does not know what formulas were actually used to calculate the overtime rates for pay to its hourly employees, such as Plaintiff, through the conclusion of Plaintiff's employment.

34. Defendant also maintains "Pay Summary" records for its employee, including Plaintiff. Those Pay Summary records do not accurately document overtime rates of pay.

35. None of Defendant's business records document additions to Plaintiff's pay that were "pre-payments" of overtime pay.

36. None of Defendant's business records document subtractions or deductions from Plaintiff's pay to reflect any "pre-payments" of overtime pay.

37. Through the conclusion of Plaintiff's employment the Defendant had no intention of making pre-payments of overtime pay to Plaintiff.

38. Defendant never informed its hourly employees, including Plaintiff, that it intended to credit any payments for paid breaks against amounts otherwise due for overtime pay under the FLSA.

39. None of Defendant's business records document any subtractions or deductions from Plaintiff's overtime pay as a credit for any paid breaks.

40. Many months, through the conclusion of his employment, Defendant paid Plaintiff a monthly incentive bonus. The amount of the bonus was not included in the regular hourly rate

from which the overtime pay rates were calculated. The bonus payments are not any of the types of payments excluded in 29 U.S.C. § 207(e)

41. The criteria for the amounts of monthly incentive bonuses are set in advance. When the criteria are changed, they are changed prospectively not retroactively.

42. The temporal scope of the monthly incentive bonuses is monthly. The monthly incentive bonus criteria are quantified based on calendar monthly results for the entire facility. That monthly period that begins on the first of the month and ends on the last of the month.

43. The percentage amount depended on the criteria calculated based on results over a calendar month. During this time, Plaintiff's entitlement to a monthly incentive bonus was not based on his individual performance during a month. It was based on the performance of the entire facility as measured by the pre-announced criteria.

44. After a month ends the various criteria are individually accounted for. Defendant typically has all the information it needs to calculate monthly incentive bonuses by the 15th of the month after the end of the month on which the bonus is earned. The bonus earned is stated as a percentage. The percentage is applied to the gross amount of pay received by the employee during the calendar month (not counting other monthly bonuses). The Plaintiff was paid every 2 weeks on Fridays. The percentage is not applied to the gross amount of pay the employee earned during the calendar month.

45. The calendar month that a monthly incentive bonus is earned is never the same time period as the 4 weeks (or sometimes 6 weeks) of previously received pay that the bonus percentage is applied to. The monthly incentive bonus paid at the end of a month (based on criteria for the prior month) is always applied to earnings from part of the month for which the criteria were considered, and also part of the month before that.

46. Defendant was sued for bonus-based violations of the FLSA in July, 2018 in a civil action styled <u>Colin Hartery v. Outokumpu Stainless USA, LLC</u>, and again in August 2018 in a civil action styled <u>William Heath Hornady v. Outokumpu Stainless USA, LLC</u>.

47. In the <u>Hornady</u> lawsuit, Defendant filed on October 2, 2020 a motion for partial summary judgment asserting that "the bonuses paid to Plaintiffs were properly calculated as a percentage of total earnings pursuant to 29 CFR 778.210 and were compliant with the FLSA, including 778.209." The Court denied Defendant's motion by Order dated February 24, 2021. Defendant did not alter its bonus practices thereafter. Defendant did not inform its Payroll Supervisor, Melissa Pledger, of the Court's rulings.

48. Under the FLSA, Plaintiff was entitled to be paid for hours worked in excess of 40 hours in each single 168 hour week at time and a half a regular hourly rate which included the monthly bonus payment. Through the conclusion of Plaintiff's employment Defendant did not include in the regular rates from which overtime pay was calculated the monthly bonus payments and Plaintiff was paid less overtime pay than the FLSA requires.

49. Under the FLSA, Plaintiff was entitled to be paid for hours worked in excess of 40 hours in each single 168 hour week at time and a half the regular hourly rate for all time compensable under the FLSA including time that Defendant rounded down, and did not pay for, under its rounding policies. Through April 6, 2021 Defendant failed to pay Plaintiff for all of the rounded down overtime he worked each 168 hour week as the FLSA requires.

50. Under the FLSA, Plaintiff was entitled to be paid for hours worked in excess of 40 hours in each single 168 hour week at time and a half a regular hourly rate which did not include time or pay from any period other than that singe 168 hour week. Through April 6, 2021 Defendant's overtime pay formulas violated the FLSA by aggregating, combining, or averaging

time and pay from different periods than a 168 hour week and for some 168 hour weeks the Plaintiff was paid less overtime pay than the FLS requires.

51. Under the FLSA, Plaintiff was entitled to be paid for hours worked in excess of 40 hours in each single 168 hour week at time and a half a regular hourly rate which was the weighted average of the rates Plaintiff was paid for hours worked within that single 168 hour week (that did not include overtime rates). Through the conclusion of Plaintiff's employment with Defendant, he was paid overtime, for some 168 hour weeks, at rates less than the FLSA requires.

52. Defendant's failure to pay Plaintiff the compensation, including overtime pay, to which he was entitled under the FLSA as alleged herein was willful, intentional, unreasonable, and not in good faith.

53. Defendant continued the unlawful practices described herein after it was on notice that they violated the FLSA from prior lawsuits.

54. Plaintiff was generally aware generally in late 2018 and 2019 that lawsuits had been filed against Defendant about overtime pay. Plaintiff's salaried supervisors in that time-frame included Steve Pittman and Steve Zielinski. Mr. Pittman and Mr. Zielinski stated to Plaintiff and in Plaintiff's presence that Defendant would find out who joined in lawsuits against it, that employees "better not" join in those lawsuits and that there would be consequences if employees did join lawsuits for overtime pay. These threats were made in the presence of both hourly and salaried OTK personnel. To Plaintiff's knowledge, they were never rescinded or retracted by Defendant. Plaintiff did not opt to join into any lawsuit against Defendant, or even to read with any level of scrutiny, the notice he received about other lawsuits in 2019 because of those threats.

## COUNT I
(Violations of the FLSA)

55. All preceding allegations are incorporated as though fully set forth herein.

56. Plaintiff is an employee fully entitled to the FLSA's protections.

57. Defendant is an employer covered by the FLSA.

58. The FLSA entitles employees to pay at 1.5 times the employee's regular hourly rate for hours worked in excess of 40 hours a week. 29 U.S.C. § 207(a).

59. By failing to pay Plaintiff for all time he was clocked in and working and/or available to work Defendant violated the FLSA's overtime pay mandates.

60. By failing to pay overtime at 1.5 times an hourly rate calculated for each 168 hour week that included monthly bonus payments, and reflected all regular pay, Defendant violated the FLSA's overtime pay mandate.

61. By failing to pay overtime at 1.5 times the regular hourly rate for all hours worked in excess of 40 hours in a work week, Defendant violated the FLSA's overtime pay mandate.

62. In violating the FLSA, Defendant acted willfully and with reckless disregard of clearly applicable FLSA provisions.

63. Plaintiff is entitled to recover for unpaid time, unpaid overtime compensation, liquidated damages, reasonable attorney's fees, and costs.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Court grant the following relief:

A. A declaratory judgment that Defendant's wage practices alleged herein violate the FLSA, 29 U.S.C. § 201 *et seq*, and attendant regulations at 29 C.F.R. § 516 *et seq*.

B. An order directing Defendant, at its own expense, to investigate and account for the number of hours actually worked by Plaintiff for each workweek, and the hourly rates for each hour worked, the amount(s) paid for overtime for each workweek, and the rates of overtime pay.

C. Judgment for damages for all unpaid and/or underpaid and/or late paid overtime compensation under the FLSA 29 U.S.C. § 201 *et seq.* and attendant regulations at 29 C.F.R. § 516 *et seq.* for the period since September 1, 2015, after application of equitable tolling of the otherwise applicable statute of limitations.

D. Judgment for liquidated damages pursuant to FLSA 29 U.S.C. § 201 *et seq.* and attendant regulations at 29 C.F.R. § 516 *et seq.* in an amount equal to all compensation owed to Plaintiff under the FLSA for unpaid or underpaid compensation during the applicable statutory period.

E. Judgment for any and all civil penalties to which Plaintiff may be entitled.

F. An order directing Defendant to pay Plaintiff's reasonable attorneys' fees and all costs connected with this action.

G. Such other and further relief as to this Court may deem necessary, just, and proper.

Respectfully Submitted.

DAVIS, DAVIS AND ASSOCIATES, P.C.
By: /s/ *Ian D. Rosenthal*
Ian D. Rosenthal – ROSEI6905
27180 Pollard Road
Daphne, AL 36526
Telephone: (251) 621-1555
Email: ian@ddalawfirm.com

SIMS LAW FIRM, LLC.
Patrick H. Sims – SIMSP8145
Post Office Box 7112
Mobile, AL 36670 (251)
490-9424
Email: patrick@simslawfirm.net

                    McDOWELL KNIGHT ROEDDER &
                      SLEDGE, LLC
                    Frederick G. Helmsing, Jr., Esq. HELMF3421 11 North Water Street, Suite 13290
                    Mobile, Alabama 36602 (251) 432-5300 (office) (251) 432 5303 (fax)
                    E-Mail: fhelmsing@mcdowellknight.com

**DEFENDANT WILL BE SERVED VIA CERTIFIED MAIL AS FOLLOWS:**

**OUTOKUMPU STAINLESS USA, LLC**
**CORPORATION SERVICE COMPANY INC**
**641 South Lawrence Street**
**Montgomery, AL 36104**